# 23-6640

*To Be Argued By:*
KENNETH L. GRESHAM

## United States Court of Appeals

### FOR THE SECOND CIRCUIT

**Docket No. 23-6640**

_____

UNITED STATES OF AMERICA,

*Appellee,*

-vs-

LANDDY RODRIGUEZ, aka Oso, PEDRO DIAZ,
SYLVESTER VANN, aka Bug,

*Defendants*,

RAMON OQUENDO, aka Mimo,

*Defendant-Appellant.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF CONNECTICUT

### BRIEF FOR THE UNITED STATES OF AMERICA

VANESSA ROBERTS AVERY
*United States Attorney*
*District of Connecticut*
157 Church Street, 25th Floor
New Haven, Connecticut 06510
(203) 821-3700

KENNETH L. GRESHAM
CONOR M. REARDON *(of counsel)*
*Assistant United States Attorneys*

**Federal Rule of Appellate Procedure 26.1
Disclosure Statement**

In this criminal case, there are no organizational victims.

# Table of Contents

Federal Rule of Appellate Procedure 26.1 Disclosure Statement............................................. i

Table of Authorities ............................................. iv

Statement of Jurisdiction ................................. xvi

Statement of Issues Presented for Review ..... xvii

Preliminary Statement.........................................1

Statement of the Case .........................................2

    A. Offense conduct ..........................................3

    B. The evidence at trial ..................................4

Summary of Argument ...................................... 11

Argument........................................................... 12

I. Oquendo's § 924(c) conviction was supported by sufficient evidence ................... 12

    A. Relevant facts ........................................... 11

    B. Governing law and standard of review .... 14

        1. Standard of review ............................... 14

        2. In furtherance of a drug trafficking offense ................................................... 16

C. Discussion .................................................. 18

    1. The evidence was sufficient to prove
       that Oquendo possessed the firearm
       in furtherance of his drug trafficking... 18

II. The district court did not err (let alone
    err plainly) by not declaring § 922(g)(1)
    unconstitutional ............................................ 23

    A. Relevant facts .......................................... 23

    B. Governing law and standard of review ... 24

       1. Standard of review ............................... 24

       2. *Heller*, *McDonald*, and felon-
         dispossession laws ............................... 25

       3. *Bruen* .................................................. 27

    C. Discussion ............................................... 30

       1. Oquendo has not shown error that
         was clear or obvious ............................ 30

       2. There was no error because, as *Bruen*
         confirms, *Bogle* remains good law ....... 34

       3. *Bogle* aside, there was no error
         because § 922(g)(1) is constitutional
         under *Bruen* .......................................... 39

iii

a. The Second Amendment's text and historical context show that convicted felons are not among "the people" entitled to exercise Second Amendment rights ................................................. 39

b. Section 922(g)(1) comports with this Nation's historical tradition of firearms regulation ............................... 45

   i. The Second Amendment right historically has extended only to law-abiding individuals............... 45

   ii. The Second Amendment right historically has extended only to responsible individuals.......... 49

c. Comparison to § 922(g)(1) ................ 59

d. Oquendo may not obtain an as-applied exemption from § 922(g)(1) based on the nature of his prior felonies ............................................. 60

Conclusion ...................................................... 65

Federal Rule of Appellate Procedure 32(g) Certification

Addendum

# Table of Authorities

Pursuant to "Blue Book" rule 10.7, the Government's citation of cases does not include "certiorari denied" dispositions that are more than two years old.

## Cases

*Avery v. Everett,*
    18 N.E. 148 (N.Y. 1888).................................. 46

*Blanton v. City of North Las Vegas,*
    489 U.S. 538 (1989) ....................................... 61

*Bowers v. United States,*
    142 S. Ct. 1396 (2022) .................................. 15

*Branzburg v. Hayes,*
    408 U.S. 665 (1972) ....................................... 61

*Bucklew v. Precythe,*
    139 S. Ct. 1112 (2019) .................................. 46

*Dean v. United States,*
    581 U.S. 62 (2017) ........................................ 15

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) ...............................*passim*

*Hamilton v. Pallozzi,*
    848 F.3d 614 (4th Cir. 2017) ......................... 40

*In re Deming,*
    10 Johns. 232 (N.Y. 1813) (per curiam)......... 47

v

*Lewis v. United States*,
    518 U.S. 322 (1996) ........................................ 61

*McDonald v. City of Chicago*,
    561 U.S. 742 (2010) ...............................*passim*

*Medina v. Whitaker*,
    913 F.3d 152 (D.C. Cir. 2019) ................*passim*

*New York State Rifle & Pistol Ass'n v. Bruen*,
    597 U.S. 1 (2022) ....................................*passim*

*Range v. Attorney General*,
    69 F.4th 96 (3d Cir. 2023) (en banc) ............. 32

*Richardson v. Ramirez*,
    418 U.S. 24 (1974) ........................................ 42

*Smith v. United States*,
    508 U.S. 223 (1993) ...................................... 16

*Spencer v. Kemna*,
    523 U.S. 1 (1998) .......................................... 42

*Tyler v. Hillsdale Cnty. Sheriff's Dep't*,
    837 F.3d 678 (6th Cir. 2016) (en banc) .......... 43

*United States v. Albarran*,
    943 F.3d 106 (2d Cir. 2019)........................... 16

*United States v. Aquart*,
    912 F.3d 1 (2d Cir. 2018)............................... 15

vi

*United States v. Baker*,
   899 F.3d 123 (2d Cir. 2018)............................ 14

*United States v. Bogle*,
   717 F.3d 281 (2d Cir. 2013)
   (per curiam)...............................................*passim*

*United States v. Bowers*,
   No. 22-6095, 2024 WL 366247
   (6th Cir. Jan. 31, 2024) .................................. 33

*United States v. Brillon*,
   No. 22-2956, 2024 WL 392949
   (2d Cir. Feb. 2, 2024) ......................... 31, 33, 34

*United States v. Brown*,
   724 F.3d 801 (7th Cir. 2013) ......................... 22

*United States v. Cassese*,
   428 F.3d 92 (2d Cir. 2005)............................. 15

*United States v. Charles*,
   469 F.3d 402 (5th Cir. 2006) ......................... 22

*United States v. Chavez*,
   549 F.3d 119 (2d Cir. 2008)........................... 15

*United States v. Colasuonno*,
   697 F.3d 164 (2d Cir. 2012)........................... 37

*United States v. Cunningham*,
   70 F.4th 502 (8th Cir. 2023).......................... 32

vii

*United States v. Finley*,
  245 F.3d 199 (2d Cir. 2001).......... 16, 17, 21, 22

*United States v. Glenn*,
  312 F.3d 58 (2d Cir. 2002)............................ 15

*United States v. Grace*,
  367 F.3d 29 (1st Cir. 2004)............................ 22

*United States v. Handy*,
  755 F. App'x 38 (2d Cir. 2018) ...................... 22

*United States v. Hill*,
  967 F.2d 902 (3d Cir. 1992)........................... 22

*United States v. Holley*,
  638 F. App'x 93 (2d Cir. 2018) ...................... 22

*United States v. Jabar*,
  19 F.4th 66 (2d Cir. 2021) ............................ 14

*United States v. Jackson*,
  69 F.4th 495 (8th Cir. 2023)...................*passim*

*United States v. Jefferson*,
  974 F.2d 201 (D.C. Cir. 1992) ...................... 64

*United States v. Jimenez*,
  895 F.3d 228 (2d Cir. 2018)........................... 24

*United States v. Jones*,
  88 F.4th 571 (5th Cir. 2023)........................... 33

*United States v. Le,*
    902 F.3d 104 (2d Cir. 2018) ............................ 24

*United States v. Lewis,*
    62 F.4th 733 (2d Cir. 2023) .......... 17, 18, 19, 21

*United States v. Lewter,*
    402 F.3d 319 (2d Cir. 2005) .................... *passim*

*United States v. Marcus,*
    560 U.S. 258 (2010) ................................. 25, 30

*United States v. McCane,*
    573 F.3d 1037 (10th Cir. 2009) ..................... 38

*United States v. Miles,*
    86 F.4th 734 (7th Cir. 2023) .......................... 33

*United States v. Peguero,*
    34 F.4th 143 (2d Cir. 2022) ........................... 38

*United States v. Robinson,*
    390 F.3d 853 (6th Cir. 2004) ......................... 22

*United States v. Snow,*
    462 F.3d 55 (2d Cir. 2006) ..................... *passim*

*United States v. Stephenson,*
    No. 12-74, 2023 WL 3402310
    (2d Cir. May 12, 2023) ............................ 31, 33

*United States v. Verdugo-Urquidez,*
    494 U.S. 259 (1990) ....................................... 43

*United States v. Vongxay,*
   594 F.3d 1111 (9th Cir. 2010) ....................... 37

*United States v. Weintraub,*
   273 F.3d 139 (2d Cir. 2001) ........................... 31

*United States v. Whab,*
   355 F.3d 155 (2d Cir. 2004) ....................*passim*

*Vincent v. Garland,*
   80 F.4th 1197 (10th Cir. 2023) ................ 32, 38

*Voisine v. United States,*
   579 U.S. 688 (2016) ........................................ 42

## Statutes

18 U.S.C. § 2 ................................................... 2, 3

18 U.S.C. § 922 ..........................................*passim*

18 U.S.C. § 924 ..........................................*passim*

18 U.S.C. § 3231 ............................................. xvi

21 U.S.C. § 841 .............................................. 2, 3

21 U.S.C. § 846 ................................................... 2

28 U.S.C. § 1291 ............................................. xvi

Conn. Gen. Stat. § 53a-217 ............................... 20

3 Jac. 1, c. 5, § 16
(1605) (Eng.) ..................................................... 47

x

1 W. & M., Sess. 1, c. 15, in 6
*The Statutes of the Realm* (1688) ...................... 50

14 Car. 2, c. 3, § 13 (Eng.).................................. 51

2 Edw. 3, c. 3 (1328) (Eng.)................................ 51

Act of Sept. 20, 1777, ch. 40, § 20, *Acts of the General Assembly of the State of New-Jersey* (1777) ................................................................ 53

Act of May 1, 1776, ch. 21, § 2, 5 *Acts and Resolves, Public and Private, of the Province of Massachusetts Bay* 480 (1886) ..........................53

Resolves of Apr. 6, 1776, 8 *The Statutes at Large of Pennsylvania from 1682-1801* (1902) ........... 53

Act of 1776, 7 *Records of the Colony of Rhode Island and Providence Plantations in New England* 567 (John Russell Bartlett ed., 1862)....... 54

Act of May 1777, ch. 3, 9 *The Statutes at Large: Being a Collection of All the Laws of Virginia, from the First Session of the Legislature, in the Year 1619* (William Waller Hening ed., 1821) .................. 54

Act of July 13, 1892, ch. 159, § 5, 27 Stat. 117 (D.C.)............................................. 57

Act of Feb. 2, 1856, No. 26, § 1, 1856 Ala. Acts ..................................................... 57

xi

Act of Apr. 8, 1881, ch. 548, § 1,
16 Del. Laws 716 (1881) ................................... 57

Act of Feb. 4, 1881, ch. 3285, No. 67, § 1,
1881 Fla. Laws 87 ....................................... 57, 58

Act of Feb. 17, 1876, No. 128, § 1,
1876 Ga. Laws 112 ............................................ 57

Act of Apr. 16, 1881, §2,
1881 Ill. Laws 73 ............................................... 57

Act of Feb. 27, 1875, ch. 40, § 1,
1875 Ind. Laws 59 ............................................. 57

Act of Mar. 29, 1884, ch. 78, § 1,
1884 Iowa Acts 86 ............................................ 57

Act of Mar. 5, 1883, ch. 105, § 1,
1883 Kan. Sess. Laws 159 .......................... 57, 58

Ky. Gen. Stat. ch. 29, Art. 29, § 1,
at 359 (Edward I. Bullock & William Johnson
eds., 1873) ......................................................... 57

Act of July 1, 1890, No. 46, § 1,
1890 La. Acts 39 ............................................... 58

Act of May 3, 1882, ch. 424, § 2,
1882 Md. Laws 656 .......................................... 58

Act of June 2, 1883, No. 138, § 1,
1883 Mich. Pub. Acts 144 ................................. 58

Act of Feb. 28, 1878, ch. 46, § 2,
1878 Miss. Laws 175 .......................................... 58

1 Mo. Rev. Stat. ch. 24, Art. II, § 1274 (1879) .. 58

Act of Feb. 17, 1899, ch. 1, § 52,
1899 N.C. Pub. Laws 20-21 ............................... 58

Act of Mar. 27, 1879, ch. 59, § 4,
1879 Conn. Pub. Acts 394 .................................. 58

Act of Mar. 27, 1879, ch. 155, § 8,
16 Del. Laws 225 (1879) .................................... 58

Act of May 3, 1890, ch. 43, § 4,
1890 Iowa Acts 69 ............................................. 58

Act of Apr. 24, 1880, ch. 257, § 4,
1880 Mass. Acts 232 ......................................... 58

Miss. Rev. Code ch. 77, § 2964 (1880) ............... 58

Act of Aug. 1, 1878, ch. 38, § 2,
1878 N.H. Laws 170 .......................................... 58

Act of May 5, 1880, ch. 176, § 4,
1880 N.Y. Laws, Vol. 2 ...................................... 58

Act of Mar. 12, 1879, ch. 198, § 2,
1879 N.C. Sess. Laws 355 .................................. 58

Act of June 12, 1879, § 2,
1879 Ohio Laws 192 .......................................... 58

xiii

Act of Apr. 30, 1879, § 2,
1879 Pa. Laws 34 ............................................... 58

Act of Apr. 9, 1880, ch. 806, § 3,
1880 R.I. Acts & Resolves 110 .......................... 58

Act of Nov. 26, 1878, No. 14, § 3,
1878 Vt. Acts & Resolves 30 ............................. 58

Act of Mar. 4, 1879, ch. 188, § 4,
1879 Wis. Sess. Laws 274 ................................. 58

## Rules

Fed. R. App. P. 4 ............................................... xvi

Fed. R. Crim. P. 52 ........................................... 24

## Other Authorities

Joseph Story, *Commentaries on the Constitution
of the United States* (1833) ............................... 41

Akhil Reed Amar, *The Bill of Rights: Creation
and Reconstruction* (1998) ................................ 41

Thomas M. Cooley, *A Treatise on the Constitu-
tional Limitations Which Rest Upon the Legisla-
tive Power of the States of the American Union*
(1868) .............................................................. 42

William Blackstone, *Commentaries on the Laws
of England* (1769) .................................... 45, 47, 51

xiv

Beth A. Colgan, *Reviving the Excessive Fines Clause*, 102 Cal. L. Rev. 277 (2014) .................. 47

David Thomas Koning, *"Dale's Laws" and the Non-Common Law Origins of Criminal Justice in Virginia*, 26 Am. J. Legal Hist. 354 (1982) ................................................................. 47

xv

## Statement of Jurisdiction

The United States District Court for the District of Connecticut (Hall, J.) had subject matter jurisdiction over this federal criminal prosecution under 18 U.S.C. § 3231. Judgment entered on June 12, 2023. *See* Appellant's Appendix ("AA__") 19 (Doc. No. 232). On June 6, 2023, the defendant filed a timely notice of appeal pursuant to Fed. R. App. P. 4(b) (which, having been filed after sentencing but before judgment, is treated as filed on the date of and after judgment). Fed. R. App. P. 4(b)(2); *see* AA19 (Doc. No. 229). This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291.

## Statement of Issues
## Presented for Review

I. Whether the evidence was sufficient to establish that the defendant's "ghost gun," seized by law enforcement from a box in his closet that also contained distribution quantities of narcotics, was possessed in furtherance of a drug trafficking crime.

II. Whether the district court committed plain error in not declaring 18 U.S.C. § 922(g)(1)—the felon-dispossession statute—unconstitutional without prompting from the defendant.

xvii

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

## Docket No. 23-6640

_____

UNITED STATES OF AMERICA,

*Appellee,*

-vs-

RAMON OQUENDO, aka MIMO,

*Defendant-Appellant.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF CONNECTICUT

## BRIEF FOR THE UNITED STATES OF AMERICA

## Preliminary Statement

Defendant-Appellant Ramon Oquendo was convicted by a jury of drug offenses as well as possessing ammunition as a convicted felon, in violation of 18 U.S.C. § 922(g)(1), and possessing a firearm in furtherance of his drug trafficking, in violation of 18 U.S.C. § 924(c). The firearm in question—a privately made "ghost gun"—was recovered when, at the culmination of a wiretap inves-

tigation, law enforcement executed a search warrant at Oquendo's apartment and found the gun in his closet, stored in a box with distribution quantities of narcotics and feet away from a dresser containing more than $40,000 in cash.

Oquendo's arguments on appeal are uniformly unconvincing. First, the evidence comfortably supported the jury's determination that he possessed the ghost gun in furtherance of his drug trafficking. Second, the district court did not plainly err when (without prompting from Oquendo) it did not deem § 922(g)(1) unconstitutional under the Second Amendment. This Court should affirm.

## Statement of the Case

On October 26, 2021, following a lengthy wiretap investigation, Oquendo was arrested at his residence during execution of a search warrant by the DEA. The next week, a grand jury indicted him on drug and gun charges. AA5 (Doc. No. 14).

On December 7, 2022, the same grand jury returned a superseding indictment naming Oquendo and three co-defendants and charging Oquendo specifically with conspiracy to distribute and possess with intent to distribute 40 grams or more of fentanyl, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(vi), and 846 (Count One); possession with intent to distribute and distribution of 40 grams or more of fentanyl, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(vi),

and 18 U.S.C. § 2 (Count Two); possession with intent to distribute and distribution of fentanyl, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 18 U.S.C. § 2 (Count Three); possession with intent to distribute controlled substances, namely cocaine, cocaine base, and fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) (Count Four); possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count Five); and possession of ammunition by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) (Count Six). AA11 (Doc. No. 91); AA802-05.

Count Three was dismissed on the government's own motion before trial. AA15 (Doc. Nos. 153, 156). The district court (Hall, J.) presided over jury selection on February 23, 2023, with evidence opening the next day. AA15 (Doc. Nos. 160, 161). On March 2, the jury found Oquendo guilty on all remaining counts. AA811-814.

On May 25, 2023, the district court imposed a total effective prison sentence of ten years (the mandatory minimum), along with five years of supervised release and $100 special assessments on each count. AA863-64. Oquendo is currently serving his sentence.

## A. Offense conduct

Oquendo and his co-defendants were indicted following a months-long wiretap investigation, jointly conducted by the Connecticut State Police

and DEA, into drug trafficking in the District of Connecticut. Presentence Report ("PSR") ¶ 7.[1]

During late summer and early fall 2021, law enforcement intercepted multiple communications involving Oquendo and co-defendants Landdy Rodriguez, Sylvester Vann, and Pedro Diaz that concerned facilitation of drug transactions. *Id.* DEA conducted physical surveillance of Oquendo and observed him engaging in drug transactions with Vann and Diaz on multiple occasions during the next several months. *Id.* The investigation culminated in a search of Oquendo's apartment in Waterbury and the seizure of distribution quantities of fentanyl and cocaine base, cutting agent, packaging materials, and a firearm. PSR ¶¶ 11-12.

### B. The evidence at trial

**Wire intercepts, surveillance, and August fentanyl seizure.** During trial the government introduced 28 intercepted phone calls involving Oquendo, Rodriguez, Diaz, and Vann. In these calls, the government argued, Rodriguez often helped coordinate or facilitate transactions between Oquendo and Diaz or Vann. Some of these calls concerned drug quantity and pricing, an inference corroborated by physical surveillance of Oquendo meeting his co-defendants in a fashion

---

[1] The district court adopted the factual statements in the PSR without objection from Oquendo. AA834-35.

consistent with conducting drug transactions and the August 12, 2021 seizure of fentanyl from co-defendant Diaz following a meeting with Oquendo. In combination with other evidence set forth below, the intercepts and surveillance helped establish Oquendo's relationships with his co-defendants and participation in a drug trafficking enterprise with them. (Indeed, he does not challenge his convictions on the drug counts—Counts One, Two, and Four.) Evidence in this vein included the following:

*August 11-12, 2021 intercepts, meeting, and fentanyl seizure.* Around 6:30 pm on August 11, Rodriguez spoke with Diaz and instructed him to go "the house." Government Appendix ("GA__") 2; AA299. About 45 minutes later, he told Oquendo that his "cousin" (*i.e.*, Diaz) "just came down from PA." GA4. Oquendo asked, "What does he want?" *Id.* Rodriguez said he would call back. *Id.*

About six minutes later, Rodriguez called back as promised. GA7. He told Oquendo, "I need you to lend me 50 bucks." *Id.* Oquendo asked if he wanted him to "bring it to you," and Rodriguez said, "[Y]eah, because . . . I'm at Cynthia's house." *Id.* He added, "I'm going to give you the money at once." *Id.*

Around this time, law enforcement was conducting surveillance at the apartment of Cynthia Cruz, Rodriguez's girlfriend. AA297, AA310. Law enforcement observed Diaz arrive in a BMW with Pennsylvania plates and meet with Rodriguez.

5

AA326-35. Oquendo then arrived and joined them. AA335-42. All three walked into Cruz's apartment and stayed inside for a time. AA343-45. Oquendo and Diaz then left. AA345.

Law enforcement followed Diaz back to Pennsylvania. AA345-49. In the early hours of August 12, at their request, the Pennsylvania State Police stopped his car and seized approximately 48.9 grams of fentanyl. AA349-50, AA506-07.

The government argued that Rodriguez had facilitated a drug transaction for about fifty grams of fentanyl—"fifty bucks," in coded terms—between Oquendo and Diaz, and that this fentanyl was later seized from Diaz in Pennsylvania. AA611-613.

*September 6, 2021.* Around 4:00 pm on September 6, Oquendo spoke with Rodriguez. GA9-10; AA187, AA193. Rodriguez told Oquendo, "[T]his guy wants to see you, OK?" GA9. Oquendo asked, "Which one?" *Id.* Rodriguez responded, "Oh, the black one." *Id.* Rodriguez then told Oquendo, "Twenty bucks," to which Oquendo said, "All right, no problem." *Id.*

About four hours later, Oquendo and Rodriguez spoke again. Rodriguez directed Oquendo to "meet him at the smoke shop across the street from McDonald's" on "Wolcott Avenue." GA12-13. DEA Task Force Officer Luis Ramos testified that he followed Oquendo from his apartment to a smoke shop on Wolcott Avenue in Waterbury.

6

AA481-82. As Officer Ramos was conducting surveillance, Rodriguez called Oquendo again to say, "[H]e should be walking towards you right now." GA15-16. While surveillance could not establish the identity of this person, the government contended at trial that Oquendo was conducting a drug transaction with Vann arranged by Rodriguez, and that Oquendo and Rodriguez used coded or oblique terms, such as "twenty bucks" to mean twenty grams of fentanyl. AA616.

*September 16, 2021.* Officer Ramos testified that, shortly after 7:00 pm on September 16, he was conducting surveillance and followed Oquendo from his apartment to Cruz's (Rodriguez's girlfriend's) Waterbury residence. AA488-90. In a recorded call at 7:11, Rodriguez told Oquendo, "[H]e already arrived." GA17-18. Oquendo responded, "All right, I'm pulling up right now." GA18. One minute later, Rodriguez spoke with Vann, who said to Rodriguez, "I seen him." GA19-20. Law enforcement then saw Vann's vehicle leaving the area of Cruz's apartment. AA493-94. At trial, the government argued that this meeting represented another transaction between Oquendo and Vann arranged by Rodriguez. AA617.

*September 22, 2021.* Around 8:00 pm on September 22, 2021, Rodriguez told Oquendo that "Bug is going to pull up on like one minute, two minutes." GA21-22. ("Bug" is Vann's nickname. AA467.) Oquendo responded, "No problem. I'm

7

in." GA22. DEA Task Force Officer Vincent Landisio testified that shortly after this phone call took place, he was conducting physical surveillance at Cruz's apartment and saw both Oquendo and Vann arrive and go inside. AA414-15. The government argued that this series of events, in light of other intercept and surveillance evidence presented to the jury, was consistent with a drug transaction between Oquendo and Vann, facilitated by Rodriguez. AA617.

**Seizure of drugs, paraphernalia, cash, and a ghost gun from Oquendo's residence.** On the morning of October 26, 2021, the investigation into Oquendo culminated in the execution of a search warrant at his Waterbury apartment. AA86-88.

DEA Special Agent Andrew Hoffman testified that, as the search team moved in, he saw Oquendo watching from a second-floor window, which turned out to be the master bedroom. AA94, AA105.

Agents searched the master bedroom. AA110-11. This bedroom was clearly in regular use and contained both men's and women's clothing, as opposed to what appeared to be second, spare bedroom that had not been slept in the night before. AA107-08.

In the closet of the master bedroom, agents found a cardboard box, which they photographed. AA111, AA778. The box contained a privately

8

made firearm, also known as a "ghost gun," with a loaded magazine wrapped to it using green cellophane. AA118-19, AA779-82. The firearm (while stamped with a product number, AA118, AA528) had no serial number and had a frame manufactured by Polymer 80, AA116-18, which (as discussed below) is a leading manufacturer of frames for ghost guns. The magazine wrapped up with the gun contained ten rounds of ammunition. AA120-24.

In addition to the ghost gun, the cardboard box contained narcotics: about 88.5 grams of fentanyl, AA130, as well as 64 grams of cocaine base, AA132-36. (As points of reference, separate testimony established that fentanyl is typically sold to end users in wax folds containing 0.02 grams of the drug, and cocaine base is often sold in small baggies containing 0.1 or 0.2 grams. AA285.) Finally, the cardboard box contained about 944 grams of phenacetin, AA139-42, a noncontrolled substance often used to "cut" narcotics before sale, AA284, and drug preparation and packaging material, AA113.

The master bedroom also contained a dresser "a foot or two" away from the closet, which contained $43,850 in cash. AA150-52. And in a second bedroom within the apartment, agents recovered about ten grams of fentanyl inside a backpack. AA152-56.

Special Agent Hoffman also testified that agents seized various items—for example, mail—

9

confirming that Oquendo lived in the apartment. AA159-63, AA786-90. Agents also recovered a video security system. AA173-174.

**Testimony on ghost guns.** ATF Special Agent Michael Oppenheim testified as an expert witness. His testimony focused on privately made firearms, also known as "ghost guns." AA524. He testified that a ghost gun is a firearm that is not "manufactured by licensed manufacturers" and is instead made privately by an individual who acquires parts, often from a kit, and assembles them into a functioning firearm. AA523-26. Special Agent Oppenheim identified the "industry leader" for these kits as a company called Polymer 80 (which produced the gun seized from Oquendo's residence). AA117-18, AA527.

Special Agent Oppenheim further testified that, while "[e]very firearm has to have a unique serial number," "[t]he overwhelming majority of privately made firearms do not." AA529. A serial number is a "unique identifier" that "separates that one firearm from all other firearms," "allow[ing] investigators like ATF or police to learn about" the firearm's history—making it "one of if not the most critical piece of information on a firearm that's being investigated by law enforcement." AA530. Nonserialized firearms "significantly hamper" investigations because, given the lack of a unique identifier, it is much more difficult for law enforcement to determine whether such a firearm has been reported stolen, trace its

10

ownership, or otherwise investigate its history as is possible with a serialized firearm. AA533-35.

## Summary of Argument

I. Sufficient evidence supported Oquendo's § 924(c) conviction. Law enforcement seized the firearm from a box in his closet that also contained distribution quantities of fentanyl and cocaine base and was feet away from a dresser containing more than $40,000 in cash. In addition, Oquendo possessed the gun unlawfully, and it was an unserialized "ghost gun"—a kind of weapon that is particularly useful to criminals because it is difficult to trace. These considerations, among other evidence, comfortably established a nexus between the gun and Oquendo's drug trafficking.

II. The district court did not commit plain error by not declaring § 922(g)(1) unconstitutional without prompting from Oquendo. His challenge is foreclosed by Second Circuit precedent upholding felon-dispossession prohibitions. And § 922(g)(1) is constitutional under the text-and-history framework set out in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022).

11

## Argument

## I. Oquendo's § 924(c) conviction was supported by sufficient evidence.

### A. Relevant facts

Following conviction, Oquendo moved for acquittal on Count Five (the § 924(c) count), arguing, as relevant, that the government "failed to establish a specific nexus between the charged firearm and the charged drug selling operation." AA816.

The district court denied the motion. AA819-27. It marshalled the government's trial evidence and stressed several especially pertinent factors articulated in *United States v. Snow*, 462 F.3d 55, 62 n.6 (2d Cir. 2006).

With regard to the *type of drug activity* factor, the district court reasoned:

[T]he Government seized nearly 100 grams of fentanyl, 64 grams of cocaine base, cutting agents, and drug packaging materials from Mr. Oquendo's residence. An FBI Agent clarified that fentanyl is typically packaged in wax folds containing .02 grams of the drug, while cocaine base is often sold in bags that contain .1 or .2 grams of the narcotic[.] As such, a rational trier of fact could conclude that the quantity of fentanyl and cocaine base recovered was indicative of large-scale drug dealing.

12

AA825-26 (citations omitted).

With regard to the *proximity* and *accessibility* factors, the district court reasoned:

> The firearm was recovered in a box that also contained more than 80 grams of fentanyl, 64 grams of cocaine base, and cutting agents. Additionally, law enforcement seized drug packaging materials in the same closet and $43,850 in cash a mere foot or two from the box. In terms of accessibility, the gun was recovered in the closet of the primary bedroom, which is where Mr. Oquendo was seen when law enforcement approached his residence to execute the search warrant.

AA826 (internal quotation marks and citations omitted).

With regard to the *status of the firearm* factor, the district court reasoned:

> The lack of a serial number is also relevant because it significantly hampers law enforcement investigations, as officers cannot easily determine whether it was stolen or previously used in the commission of a crime.

*Id.* (internal quotation marks, alteration, and citations omitted).

The district court noted that the gun was unloaded when recovered. *Id.*; *see Snow*, 462 F.3d at

13

62 n.6 (court may consider this factor). But that was just one factor "of many." AA826. Moreover, "ten rounds of ammunition were found attached to the gun." *Id.* (internal quotation marks omitted).

Accordingly, a rational jury could have found that Oquendo's "possession of the weapon 'facilitated or advanced the instant drug trafficking offense by protecting himself, his drugs, and his business.'" *Id.* (quoting *Snow*, 462 F.3d at 63).

## B. Governing law and standard of review

### 1. Standard of review

This Court "review[s] sufficiency of evidence challenges *de novo*." *United States v. Baker*, 899 F.3d 123, 129 (2d Cir. 2018). In doing so, it "will sustain the jury's verdict if *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (internal quotation marks and citation omitted).

The Court "must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of . . . the weight of the evidence." *United States v. Jabar*, 19 F.4th 66, 76 (2d Cir. 2021) (internal quotation marks omitted), *cert. denied sub nom. Bowers v. United States*, 142 S. Ct. 1396 (2022). "These principles apply whether

14

the evidence being reviewed is direct or circumstantial," *United States v. Chavez*, 549 F.3d 119, 125 (2d Cir. 2008), *abrogated on other grounds by Dean v. United States*, 581 U.S. 62 (2017), and the court must view the evidence "in its totality, as each fact may gain color from others," *United States v. Cassese*, 428 F.3d 92, 98-99 (2d Cir. 2005) (internal quotation marks and citations omitted).

When describing the sufficiency standard, Oquendo relies on the so-called "equipoise rule"— "derived from *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002)," *United States v. Aquart*, 912 F.3d 1, 44-45 (2d Cir. 2018)—which specified that "if the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." *Glenn*, 312 F.3d at 70 (internal quotation marks omitted); Appellant's Br. 15-16. But this Court has expressly held that this rule "is of no matter to sufficiency analysis because it is the task of the jury, not the court, to choose among competing inferences." *Aquart*, 912 F.3d at 44 (internal quotation marks omitted). "Thus, [this Court has] held the equipoise rule to apply only where evidence is so nonexistent or so meager as to preclude the inferences necessary to a finding favorable to the government." *Id.* at 44-45.

15

### 2. In furtherance of a drug trafficking offense

To convict for possession of a firearm in furtherance of a drug trafficking offense under 18 U.S.C. § 924(c), the government must prove that the defendant possessed the firearm and "that the possession occurred in furtherance of a drug trafficking crime." *United States v. Albarran*, 943 F.3d 106, 118 (2d Cir. 2019) (internal quotation marks and citation omitted).

Section 924(c) requires the government to establish a "nexus" between the charged firearm and the charged drug selling operation. *United States v. Finley*, 245 F.3d 199, 203 (2d Cir. 2001). Such a nexus can be established where the firearm "afforded some advantage (actual or potential, real or contingent)" to the drug trafficking. *United States v. Lewter*, 402 F.3d 319, 322 (2d Cir. 2005). While "the mere presence of a weapon at the scene of a drug crime, *without more*, is insufficient to prove that the gun was possessed in furtherance of the drug crime," *United States v. Snow*, 462 F.3d 55, 62 (2d Cir. 2006) (internal quotation marks omitted), this requirement is satisfied where the gun "facilitat[ed]" or had "the potential of facilitating [a] drug trafficking offense," *Smith v. United States*, 508 U.S. 223, 238 (1993) (internal quotation marks and alterations omitted).

The question whether a firearm was used "in furtherance" of drug dealing "is a fact-intensive

16

inquiry well-suited to resolution by a jury." *United States v. Lewis*, 62 F.4th 733, 746 (2d Cir. 2023). In particular, the factfinder should examine factors including "the type of drug activity that is being conducted, accessibility of the firearm, the type of the weapon, whether the weapon is stolen, the status of the possession (legitimate or illegal), whether the gun is loaded, proximity to drugs or drug profits, and the time and circumstances under which the gun is found." *Snow*, 462 F.3d at 62 n.6 (internal citations omitted); *see Lewis*, 62 F.4th at 746 (emphasizing strength of government's evidence given that the defendant's "packaged drugs and gun were found *together* at his home"); *Lewter*, 402 F.3d at 322 (gun with "an obliterated serial number," "loaded with hollow-point bullets," and "stored within feet of Lewter's drug stash" could be used to prove "in furtherance"); *Finley*, 245 F.3d at 203 (emphasizing "proximity" of a shotgun to the defendant's drug stash). "[W]hile no conviction would lie for a drug dealer's innocent possession of a firearm, a drug dealer may be punished under § 924(c)(1)(A) where the charged weapon is readily accessible to protect drugs, drug proceeds, or the drug dealer himself." *Snow*, 462 F.3d at 62-63.

17

## C. Discussion

### 1. The evidence was sufficient to prove that Oquendo possessed the firearm in furtherance of his drug trafficking.

The trial evidence easily supported an inference that Oquendo possessed the ghost gun because it "afforded some advantage (actual or theoretical, real or contingent) relevant to" his drug trafficking, *Lewis*, 62 F.4th at 746 (internal quotation marks omitted)—and that this was *not* a case of "mere presence," *id.* at 745 (internal quotation marks omitted), or "innocent possession," *Snow*, 462 F.3d at 62. Indeed, virtually every factor identified in *Snow* favors the government.

First, as the district court correctly concluded, Oquendo was engaged in a large-scale conspiracy to possess with intent to distribute and distribute narcotics. *See Snow*, 462 F.3d at 62 n.6 (court should consider "the type of drug activity that is being conducted"). Wiretap and surveillance evidence established his frequent drug-related contact with his co-defendants between August and October 2021. *See* Statement of the Case A. He was convicted of distributing 40 grams or more of fentanyl in connection with the August 11 transaction that ended with the seizure of almost 50 grams of fentanyl in Pennsylvania. *See id.* The search of his apartment turned up almost 100 grams of fentanyl, 64 grams of cocaine base, large quantities of cutting agent, and more than

18

$40,000 the jury could reasonably have determined represented drug proceeds. *See id.*; AA110-56, AA778-82. Oquendo was not engaged in one-off, minor drug sales, but a regularized and profitable operation that, the jury could have inferred, he wanted to protect with the help of a firearm. *Snow*, 462 F.3d at 62 n.6. Indeed, the fact that agents recovered a security system from the apartment tended to confirm Oquendo's commitment to protecting his enterprise. AA173-74.

Second, the gun was not only readily accessible to Oquendo, but stored with and near both drugs and proceeds. *Snow*, 462 F.3d at 62 n.6 ("accessibility of the firearm" and "proximity to drugs or drug profits"). The evidence supported an inference that the master bedroom was Oquendo's (and, indeed, he was seen there by agents as they initiated the search). Statement of the Case A.; AA94, AA105-11. The gun was stored in a cardboard box that also contained distribution quantities of narcotics—about 88 grams of fentanyl and 64 grams of cocaine base—and within feet of a dresser containing $43,850 in cash. AA130-36, AA150-56. This arrangement was to Oquendo's advantage in the event the need arose to protect his drugs or money: the gun was with the drugs and money, and all of them were easily accessible to Oquendo. *See Lewis*, 62 F.4th at 746 ("The relevant evidence against Lewis is far stronger because . . . his packaged drugs and gun were found *together* at his home."); *Lewter*, 402 F.3d at 322

19

("Moreover, the gun was stored within feet of Lewter's drug stash and within Lewter's reach.").

Third, the "type of weapon" and "status of [Oquendo's] possession (legal or illegal)" weigh strongly against him. *Snow*, 462 F.3d at 62 n.6. He possessed the gun unlawfully in that he was a convicted felon. *See* 18 U.S.C. § 922(g)(1); Conn. Gen. Stat. § 53a-217. Even more important, he possessed a ghost gun—*i.e.*, a privately made firearm lacking a serial number, a characteristic that can "significantly hamper" law enforcement efforts to determine a gun's ownership and history. AA533-35. The fact that a ghost gun cannot be traced in the same way as a serialized firearm offers obvious advantages to criminals—a fact that "militate[s] against an inference of innocent use, such as target practice or hunting."[2] *Lewter*, 402 F.3d at 322; *see id.* (relying on gun's obliterated serial number).

Finally, as for the "time and circumstances under which the gun [was] found," agents recovered it while executing a search warrant at the culmination of an investigation into Oquendo's ongoing drug trafficking—and found it in a cardboard box

---

[2] Since manufacturing or otherwise obtaining a ghost gun need not create any record associating the gun with its owner, possessing such a weapon can afford criminals some of the same advantages as possessing a stolen gun—a separate factor under *Snow*. 462 F.3d at 62 n.6.

20

next to large quantities of narcotics in a room where Oquendo had been moments before. *Snow*, 462 F.3d at 62. These circumstances comfortably support an inference that Oquendo possessed the gun not for any legitimate purpose, but because it "afforded some advantage (actual or theoretical, real or contingent) relevant to" his drug trafficking (his convictions for which he does not challenge on appeal). *Lewis*, 62 F.4th at 746 (internal quotation marks omitted).

Oquendo's brief focuses largely on the fact that the firearm was unloaded, which is unconvincing on multiple fronts. First, as a factual matter, a loaded magazine was stored with (indeed, bound to) the gun, so that—as he concedes—the gun would be "usable" as soon as the magazine was "unwrapped and loaded." Appellant's Br. 19-20. Storing the gun and loaded magazine together afforded Oquendo very nearly the same "advantage (actual or theoretical, real or contingent)" that a loaded firearm would have. *Lewis*, 62 F.4th at 746. In that sense it is not even clear that this individual factor favors him.

Second, as a legal matter, whether a gun is loaded is one factor "of many." AA826. So it is unsurprising that many courts of appeals (including this one) have affirmed § 924(c) convictions based on unloaded firearms. *See, e.g.*, *Finley*, 245 F.3d at 202-03. Oquendo dismisses *Finley* as a plain-error case focused on possession, not "in furtherance," but this Court explicitly concluded that

21

"the jury could properly have found that Finley kept the [unloaded] shotgun for protection in proximity to the window from which he sold the drugs." *Finley*, 245 F.3d at 203. Subsequent cases have both approvingly cited *Finley*'s holding as to unloaded weapons and reaffirmed that an unloaded weapon may satisfy § 924(c). *See Lewter*, 402 F.3d at 322 ("Finley's gun (though unloaded) quite evidently provided security during drug transactions . . . ."); *United States v. Holley*, 638 F. App'x 93, 99 (2d Cir. 2018) (affirming § 924(c) conviction based on two firearms, one loaded and one not, in the defendant's apartment); *United States v. Handy*, 755 F. App'x 38, 43 (2d Cir. 2018) (concluding, on reviewing factual basis for plea under Rule 11, that four firearms satisfied in-furtherance requirement, even though three were unloaded). Other courts of appeals agree.[3]

---

[3] They have noted both that an unloaded weapon may become loaded and that even an unloaded gun may be used to intimidate in furtherance of drug trafficking. *See, e.g.*, *United States v. Grace*, 367 F.3d 29, 36 (1st Cir. 2004) ("Even an unloaded firearm can intimidate others and help to further the defendant's drug-related activities."); *United States v. Hill*, 967 F.2d 902, 907 (3d Cir. 1992) ("Hill's rifle, even if unloaded, still had the potential to facilitate his unlawful possession of cocaine."); *United States v. Charles*, 469 F.3d 402, 407 (5th Cir. 2006) (sustaining § 924(c) conviction for "unloaded and partially disassembled" firearm); *United States v. Robinson*, 390 F.3d 853, 878 (6th Cir. 2004) ("[A] weapon need not be . . . loaded in order to

22

Oquendo adds that the government did not present evidence that he carried a firearm while distributing drugs or that he sold drugs from his apartment. Appellant's Br. 20-21. But the government did not need to show that Oquendo carried a gun during a deal—that is a separate way of violating § 924(c)—and this Court has specifically rejected the argument that the statute requires a showing that the defendant kept a gun in the location where he sold drugs. *See* 18 U.S.C. § 924(c)(1)(A) (unlawful to possess a firearm in furtherance of a drug trafficking crime *or* to "use[] or carr[y] a firearm" "during and in relation to" a drug trafficking crime); *Lewter*, 402 F.3d at 322 (rejecting defendant's argument that evidence was insufficient because he "did not sell drugs inside his apartment," where gun was stored).

The jury's verdict on Count Five was comfortably supported by the evidence.

---

sustain a conviction under § 924(c)."); *United States v. Brown*, 724 F.3d 801, 803 (7th Cir. 2013) (noting that an unloaded gun may be used to facilitate a drug crime).

23

## II. The district court did not err (let alone err plainly) by not declaring § 922(g)(1) unconstitutional.

### A. Relevant facts

Count Six charged Oquendo with possessing ammunition as a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). AA112-17, AA122-25. The superseding indictment specified seven separate felonies of which Oquendo had been convicted, including four involving narcotics sales and one involving possessing a pistol without a permit. AA805; *see* PSR ¶¶ 41-47 (setting out criminal history). At trial, Oquendo stipulated that he had been convicted of a felony prior to the charged possession. AA690.

### B. Governing law and standard of review

#### 1. Standard of review

This Court typically reviews "de novo a district court's determination that the application of a law does not violate the Second Amendment." *United States v. Jimenez*, 895 F.3d 228, 232 (2d Cir. 2018). But (as Oquendo concedes, Appellant's Br. 23-24) when, as in this case, a defendant fails to challenge the constitutionality of a statute in district court, this Court reviews for plain error. *See* Fed. R. Crim. P. 52(b); *United States v. Le*, 902 F.3d 104, 109 (2d Cir. 2018).

Applying this standard, "an appellate court may, in its discretion, correct an error not raised

24

at trial only where the appellant demonstrates that (1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights, which in the ordinary case means it affected the outcome of the district court proceedings; and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *United States v. Marcus*, 560 U.S. 258, 262 (2010) (internal quotation marks and alterations omitted).

"For an error to be plain, it must, at a minimum, be clear under current law." *United States v. Whab*, 355 F.3d 155, 158 (2d Cir. 2004) (internal quotation marks omitted). This Court "typically will not find such error where the operative legal question is unsettled, including where there is no binding precedent from the Supreme Court or this Court." *Id.* (internal quotation marks omitted).

### 2. *Heller*, *McDonald*, and felon-dispossession laws

In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court held that the Second Amendment protects "the right of law-abiding, responsible citizens" to possess handguns in the home for self-defense. 554 U.S. at 635. Consistent with that interpretation, the Court cautioned that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally

25

ill"—restrictions it described as "presumptively lawful." *Id.* at 626-27 & n.26; *see also id.* at 631-635 (holding that the District of Columbia was required to issue the plaintiff a handgun license if he was "not disqualified from the exercise of Second Amendment rights," meaning, among other things, that he was "not a felon" and "not insane"). The Court explained that these "permissible" "regulations of the right" to bear arms had "historical justifications." *Id.* at 635.

Two years later, a plurality of the Court—in holding the Second Amendment right applicable against the states—reaffirmed this understanding. *See McDonald v. City of Chicago*, 561 U.S. 742 (2010). The *McDonald* plurality observed that the Court had "made it clear in *Heller* that [its] holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill,'" among others. *Id.* at 786. The plurality "repeat[ed] those assurances." *Id.*

In the wake of *Heller* and *McDonald*, the federal courts of appeals applied varied analytical approaches in Second Amendment cases. In some, courts applied a hybrid of historical analysis and means-end scrutiny to firearms regulations. *See N.Y. State Rifle Ass'n, Inc. v. Bruen*, 597 U.S. 1, 17 (2022). In others, however, they relied on *Heller*'s enumeration of "permissible" "regulations" that were supported by "historical justifications." *Heller*, 554 U.S. at 635.

26

One such case was *United States v. Bogle*, 717 F.3d 281 (2d Cir. 2013) (per curiam), which came before this Court two years after *McDonald*. The defendant, convicted of possessing a firearm as a convicted felon, challenged § 922(g)(1) under the Second Amendment. *Bogle*, 717 F.3d at 281. This Court rejected the challenge, thus "join[ing] every other circuit to consider the issue in affirming that § 922(g)(1) is a constitutional restriction on the Second Amendment rights of convicted felons." *Id.* at 281-82; *see id.* at 282 n.1 (collecting cases). The Court explained that both *Heller* and *McDonald* had taken care to emphasize that they did not "'cast doubt on longstanding prohibitions on the possession of firearms by felons.'" *Id.* at 281 (quoting *Heller*, 554 U.S. at 626).

### 3. *Bruen*

*Bruen* considered a New York law that provided for a discretionary "proper cause" licensing regime to carry a firearm outside the home, which this Court had upheld using means-end analysis. 597 U.S. at 11-13, 16-17. The Supreme Court reversed, rejecting the means-end test and reiterating "*Heller*'s methodology centered on constitutional text and history" as the proper framework. *Id.* at 16-17, 22. Under this framework, "the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by

27

demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 24.

In assessing whether the Second Amendment's text covers an individual's conduct, a court must consider the "textual elements" of the "operative clause," which provides that "the right of the people to keep and bear Arms, shall not be infringed." *Id.* at 32 (quoting U.S. Const. amend. II). "The right" refers to "a *pre-existing* right," *id.* at 25—one that "is not unlimited" and is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose," *Heller*, 554 U.S. at 626. The individual must be "part of 'the people' whom the Second Amendment protects." *Bruen*, 597 U.S. at 31-32. The weapons in question must be "[a]rms" as the Second Amendment uses the term, *i.e.*, "weapons in common use today for self-defense." *Id.* at 32 (internal quotation marks omitted). And the Amendment's text must reach the individual's "proposed course of conduct"—that is, the conduct must qualify as "keep[ing]" or "bear[ing]" arms. *Id.*

If the text covers an individual's conduct, the government must show that its regulation is "consistent with this Nation's historical tradition of firearm regulation." *Id.* at 33-34. This "historical inquiry . . . will often involve reasoning by analogy." *Id.* at 28. "[D]etermining whether a historical regulation is a proper analogue for a distinctly

28

modern firearm regulation requires a determination of whether the two regulations are relevantly similar." *Id.* at 28-29 (internal quotation marks omitted). In conducting this analysis, courts should consider "at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense," *i.e.*, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 29.

"[A]nalogical reasoning under the Second Amendment" "requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* at 30. "So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.*

*Bruen* expanded on *Heller* and *McDonald* by elaborating the historical inquiry required in Second Amendment cases. But, like *Heller* and *McDonald*, it insisted on clear limits to the scope of the Second Amendment right—including, in particular, that the right protects only "law-abiding citizen[s]." *Id.* at 8 (Second Amendment "protects the right of an ordinary, law-abiding citizen"); *id.* at 15 (describing petitioners as "law-abiding, adult citizens"); *id.* at 26 ("law-abiding, responsible citizens" (quoting *Heller*, 554 U.S. at 635)); *id.* at 29 (describing "a law-abiding citizen's

29

right to armed self-defense"); *id.* at 30-31 (considering limits of "sensitive places" where "government may lawfully disarm law-abiding citizens"); *id.* at 31-32 (petitioners, as "ordinary, law-abiding adult citizens," are part of "the people"); *id.* at 38 (no historical tradition limiting public carry only to "law-abiding citizens" with a special need for self-defense); *id.* at 60, 70 (same). Justice Kavanaugh, concurring, reiterated *Heller*'s admonition that "longstanding prohibitions on the possession of firearms by felons" were "presumptively lawful." *Id.* at 81 (Kavanaugh, J., concurring). And Justice Alito, in his own concurrence, stressed that the opinion did not disturb "anything . . . in *Heller* or *McDonald*" concerning "restrictions that may be imposed on the possession or carrying of guns." *Id.* at 72 (Alito, J., concurring).

### C. Discussion

#### 1. Oquendo has not shown error that was clear or obvious.

For the reasons set forth below, there was no constitutional error in this case. *Bogle* remains binding precedent after *Bruen*. *See* Part II.C.2., *infra*. And even if *Bruen* disturbed *Bogle*'s reasoning, Oquendo's conviction was constitutional under *Bruen*'s text-and-history framework. *See* Part II.C.3., *supra*.

But the Court need not reach these questions. Oquendo did not raise his constitutional challenge below, so he may obtain relief only by (among other requirements) showing error that was "clear or obvious." *Marcus*, 560 U.S. at 262. He has not done so.

This Court has addressed (in unpublished dispositions) plain-error challenges to § 922(g), including § 922(g)(1)'s felon-possession restriction. In *United States v. Stephenson*, No. 12-74, 2023 WL 3402310 (2d Cir. May 12, 2023), the defendant raised a forfeited constitutional challenge to his conviction for possessing a firearm as an unlawful user of a controlled substance, in violation of 18 U.S.C. § 922(g)(3). *Id.* at *1. The Court noted that a "'reviewing court typically will not find'" plain error "'where the operative legal question is unsettled.'" *Id.* (quoting *United States v. Weintraub*, 273 F.3d 139, 152 (2d Cir. 2001)). Because "the contention that 18 U.S.C. § 922(g)(3) is unconstitutional is not clear under current law," the Court "discern[ed] no plain error." *Id.*

So too in *United States v. Brillon*, No. 22-2956, 2024 WL 392949 (2d Cir. Feb. 2, 2024), in which the defendant argued, on plain error review, that § 922(g)(1) was unconstitutional under *Bruen*. *Id.* at *1. The Court noted that, in *Bogle*, it had previously upheld the constitutionality of § 922(g)(1). *Id.* "*Bruen*, which arose from a civil challenge to New York State's gun licensing requirements, did not concern the constitutionality of Section

31

922(g)(1)." *Id.* The defendant identified no post-*Bruen* Second Circuit authority calling into question the constitutionality of § 922(g)(1), and, indeed, *Stephenson* had upheld § 922(g)(3) against plain error challenge. *Id.* So, "at a minimum, . . . the constitutional infirmity alleged by [the defendant was] not clear under current law," foreclosing plain error relief. *Id.*

Those decisions are correct. Since "there is no binding precedent from the Supreme Court or this Court" invalidating § 922(g)(1), Oquendo cannot obtain relief. *Whab*, 355 F.3d at 158 (internal quotation marks omitted).

Indeed, several courts of appeals have upheld § 922(g)(1) under *Bruen*. The Eighth Circuit has held that the statute complies with the Second Amendment in all its applications. *See United States v. Cunningham*, 70 F.4th 502, 506 (8th Cir. 2023), *pet. for cert. filed*, No. 23-6602 ("[T]here is no need for felony-by-felony determinations regarding the constitutionality of § 922(g)(1) as applied to a particular defendant."); *United States v. Jackson*, 69 F.4th 495, 502-06 (8th Cir. 2023). The Tenth Circuit has held that its pre-*Bruen* precedent holding § 922(g)(1) constitutional in all its applications still controls. *Vincent v. Garland*, 80 F.4th 1197, 1202 (10th Cir. 2023). The Third Circuit issued a "narrow" ruling that § 922(g)(1) was invalid "only as applied to [the defendant] given his [disqualifying] violation"—a Pennsylvania offense, classified by the state as a misdemeanor

32

although punishable by more than a year in prison, that involved making a false statement to obtain food stamps. *Range v. Attorney General*, 69 F.3d 96, 98, 106 (3d Cir. 2023) (en banc).

In short, Oquendo cannot point to a single federal appellate decision invalidating § 922(g)(1) as applied to a defendant like him—*i.e.*, one disqualified from firearms possession based on multiple prior narcotics trafficking felonies (as well as a firearms offense). AA805; *see* PSR ¶¶ 41-47. Even assuming *Range* supports him—which requires disregarding the decision's self-avowed limitations—he has shown, at *most*, a "legal question" that is "unsettled." *Whab*, 355 F.3d at 158 (internal quotation marks omitted). And that means no plain error relief, as this Court held in both *Stephenson* and *Brillon*. Other courts of appeals have reached the same result; indeed, Oquendo has not identified any case holding a § 922(g)(1) defendant entitled to plain error reversal under *Bruen*. *See, e.g.*, *United States v. Jones*, 88 F.4th 571, 573-74 (5th Cir. 2023), *pet. for cert. filed*, No. 23-6769 ("Given the absence of binding precedent holding that § 922(g)(1) is unconstitutional, and that it is unclear that *Bruen* dictates such a result, we have rejected plain-error challenges to § 922(g)(1) under *Bruen* . . . . [T]his unsettled question is not clear or obvious error."); *United States v. Bowers*, No. 22-6095, 2024 WL 366247, at *3 (6th Cir. Jan. 31, 2024) ("No binding case law addresses the constitutionality of § 922(g)(1)

33

in light of *Bruen*, thus precluding a finding of plain error."); *United States v. Miles*, 86 F.4th 734, 740-41 (7th Cir. 2023) (same).

In addressing the clear-or-obvious requirement, Oquendo does not acknowledge the authority against him, let alone reckon with it. Instead, he misstates the pertinent inquiry by arguing that it was "obvious" the district court should have "address[ed] the . . . constitutionality" of § 922(g)(1) under *Bruen*. Appellant's Br. 32. But the question is not whether it was clear that *Bruen* raised some arguable constitutional issue the district court could have entertained. The question is whether *Bruen* made it "clear" that § 922(g)(1) "is unconstitutional." *Brillon*, 2024 WL 392949, at *1; *see Whab*, 355 F.3d at 158. As explained, it did not, and neither has any other decision of the Supreme Court or this Court.

Oquendo's failure to show clear or obvious error forecloses relief. The Court need not decide whether there was error at all—but, as explained below, there was not.

## 2. There was no error because, as *Bruen* confirms, *Bogle* remains good law.

In *Bogle*, this Court upheld § 922(g)(1) against a Second Amendment challenge. 717 F.3d at 281-82. Its basis was the express limitations set forth in *Heller* and *McDonald* making clear that those

decisions did not "'cast doubt on longstanding prohibitions on the possession of firearms by felons.'" *Id.* at 281 (quoting *Heller*, 554 U.S. at 626).

Oquendo acknowledges *Bogle* but argues that *Bruen* "announced a new standard for assessing Second Amendment challenges," ending the previous means-end scrutiny approach. Appellant's Br. 24-25. This argument ignores *Bogle*'s analysis. *Bogle* did not employ means-end scrutiny. Instead, it rested on *Heller*'s endorsement (later reiterated in *McDonald*) of certain "permissible" "regulations of the [Second Amendment] right," such as "longstanding prohibitions on the possession of firearms by felons," that had "historical justifications." *Heller*, 554 U.S. at 626-27, 635; *Bogle*, 717 F.3d at 281-82. So the question is whether *Bruen* upset *Heller*'s analysis in this regard.

It did not. As discussed, *Bruen* elaborated on the historical inquiry *Heller* and *McDonald* required. In so doing, it noted that *Heller* "relied on the historical understanding of the Amendment to demark the limits on the exercise of that right," *Bruen*, 597 U.S. at 21—such as felon-possession prohibitions, *Heller*, 554 U.S. at 626-27, 635. Far from discarding *sub silentio Heller*'s and *McDonald*'s admonitions regarding the legality of felon disarmament, *Bruen* then doubled down on their commitment to the principle that the Second Amendment right extends only to "law-abiding,

35

responsible citizens." 554 U.S. at 635. In describing the basic historical inquiry that governs Second Amendment cases, *Bruen* directed lower courts to consider "how and why" a challenged regulation "burden[s] a law-abiding citizen's right to armed self-defense." 597 U.S. at 29. Indeed, the Court focused relentlessly on this concept throughout the opinion. *Id.* at 8 (Second Amendment "protects the right of an ordinary, law-abiding citizen"); *id.* at 15 ( "law-abiding, adult citizens"); *id.* at 26 ("law-abiding, responsible citizens" (quoting *Heller*, 554 U.S. at 635)); *id.* at 29 ("a law-abiding citizen's right to armed self-defense"); *id.* at 30-31 ("law-abiding citizens"); *id.* at 31-32 ("ordinary, law-abiding adult citizens"); *id.* at 38 ("law-abiding citizens"); *id.* at 60, 70 (same). Separate writings drove home the same point. *See id.* at 81 (Kavanaugh, J., concurring) (reiterating that "longstanding prohibitions on the possession of firearms by felons" were "presumptively lawful" (internal quotation marks omitted)); *id.* at 72 (Alito, J., concurring) (majority did not disturb "anything . . . in *Heller* or *McDonald*" concerning "restrictions that may be imposed on the possession of guns"); *id.* at 129 (Breyer, J., dissenting) ("Like Justice Kavanaugh, I understand the Court's opinion today to cast no doubt on that aspect of *Heller*'s holding" concerning felon disarmament).

Oquendo argues that *Heller*'s statement regarding felon-dispossession laws was dicta that

*Bruen* "called into question." Appellant's Br. 27. Not so. First, *Heller*'s statement (later reiterated in *McDonald*) was an express limitation on the Court's holding regarding the scope of the Second Amendment right—making it an "integral" part of that holding. *United States v. Vongxay*, 594 F.3d 1111, 1115 (9th Cir. 2010) (rejecting this *Heller* argument and noting that "[c]ourts often limit the scope of their holdings, and such limitations are integral to those holdings"). Second, *Bogle* evidently treated these statements from *Heller* and *McDonald* as binding—or, at least, as deserving the "usual . . . great deference" accorded "Supreme Court *dicta*." *United States v. Colasuonno*, 697 F.3d 164, 179 (2d Cir. 2012). In any case, when *Bogle* so grounded its holding, these reassurances from *Heller* and *McDonald* became the law in this Circuit (even assuming they were not already). And finally, as already explained, *Bruen* did not "call[] into question" this aspect of *Heller* and *McDonald*, Appellant's Br. 27, but reemphasized it.

Indeed, the premise that the Second Amendment protects only law-abiding citizens—as opposed to, say, felons—is baked into binding doctrine several times over. For example, in determining whether the text protects particular types of weapons, a court must ask whether those weapons are "typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625. In judging whether modern firearms regulations

37

are consistent with their historical precursors, courts must ask "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 597 U.S. at 29. And the government may require gun owners to pass background checks—which include a check for felony convictions—because such checks ensure that those who carry guns "are, in fact, 'law-abiding, responsible citizens.'" *Bruen*, 597 U.S. at 38 n.9 (quoting *Heller*, 554 U.S. at 635).

In short, contrary to Oquendo's argument that *Bruen* abrogated *Bogle*, *Bruen confirmed* that *Bogle* is sound. *Bogle* accordingly governs here. *See United States v. Peguero*, 34 F.4th 143, 158 (2d Cir. 2022).

In similar circumstances, the Tenth Circuit recently affirmed the precedential force of a pre-*Bruen* decision upholding § 922(g)(1). In *Vincent*, the court concluded that it was bound by its prior holding in *United States v. McCane*, 573 F.3d 1037, 1047 (10th Cir. 2009). *McCane*, like *Bogle*, had not employed the means-end scrutiny framework disapproved in *Bruen*, but relied on *Heller*'s statement that felon-dispossession laws remained constitutional. *Vincent*, 80 F.4th at 1201. The court went on to say that *Bruen*, far from calling § 922(g)(1) into doubt, tended to confirm its validity: "Given the six Justices' reaffirmation of the *Heller* language and the Court's apparent approval of 'shall-issue' regimes and related back-

38

ground checks, we conclude that *Bruen* did not indisputably and pellucidly abrogate our precedential opinion in *McCane*." *Id.* at 1202. So too for *Bogle*.

### 3. *Bogle* aside, there was no error because § 922(g)(1) is constitutional under *Bruen*.

Even ignoring *Bogle*, Oquendo has not shown error. Undertaking afresh the text-and-history approach *Bruen* prescribes demonstrates that § 922(g)(1) is a valid restriction.

Three independent but mutually reinforcing legal principles support the Supreme Court's approval of felon-disarmament laws. First, felons disqualified from possessing firearms under § 922(g)(1) are not among "the people" protected by the Second Amendment. Second, the Second Amendment has historically been understood to protect law-abiding individuals, not convicted felons. Third, the Second Amendment has historically been understood to protect only responsible individuals, and felons, as a category, are not responsible.

### a. The Second Amendment's text and historical context show that convicted felons are not among "the people" entitled to exercise Second Amendment rights.

The Second Amendment secures "the right of the people to keep and bear arms." U.S. Const.

39

amend. II. Under *Bruen*, a court must ask whether an individual falls within this text—including whether he is "part of 'the people' whom the Second Amendment protects." *Bruen*, 597 U.S. at 31-32; *see id.* at 17 (court must look to "the Second Amendment's plain text" and "this Nation's historical tradition of firearm regulation").

As a matter of both text and history, the Second Amendment does not prevent legislatures from prohibiting firearm possession by those who have shown disregard for the rule of law through commission of a felony offense—as courts of appeals have concluded both before and after *Bruen*. *See Jackson*, 69 F.4th at 505 (concluding that "legislatures traditionally employed status-based restrictions to disqualify categories of persons from possessing firearms" and that "Congress acted within the historical tradition when it enacted § 922(g)(1) and the prohibition on possession of firearms by felons"); *Medina v. Whitaker*, 913 F.3d 152, 157-61 (D.C. Cir. 2019) ("hold[ing] that those convicted of felonies are not among those entitled to possess arms" and "reject[ing] the argument that non-dangerous felons have a right to bear arms" based on "tradition and history"); *Hamilton v. Pallozzi*, 848 F.3d 614, 626 (4th Cir. 2017) (holding that "conviction of a felony necessarily removes one from the class of 'law-abiding, responsible citizens' for the purposes of the Second Amendment").

40

These decisions are firmly supported by the Amendment's text. "'The people'" is "a term of art employed in select parts of the Constitution" to refer to "a class of persons who are part of a national community." *Heller*, 554 U.S. at 580 (alteration and citation omitted). The Second Amendment thus guarantees the right to bear arms only to "members of the political community," not to all persons. *Id.*

The Second Amendment's background illuminates the reasons for that limitation. The Founders codified the right to bear arms in large part because they regarded it as an important "safeguard against tyranny." *Id.* at 600. Justice Story, for instance, described the right to bear arms as the "palladium of the liberties of a republic" and explained that it "enable[s] the people to resist and triumph over" the "usurpation and arbitrary power of rulers." 3 Joseph Story, *Commentaries on the Constitution of the United States* § 1890, at 746 (1833). It makes sense that a right that was codified to enable the polity to "resist tyranny," *Heller*, 554 U.S. at 598, would be limited to the members of that polity.

Consistent with that understanding, persons who do not belong to the political community have historically been denied the right to bear arms. For example, the right to bear arms has historically been reserved to "citizens." *Heller*, 554 U.S. at 635; *see id.* at 581 ("Americans"). Noncitizens at the Founding lacked the "right to bear arms"—

41

just as they lacked other "rights of members of the polity," such as the right to "vote, hold public office, or serve on juries." Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* 48 (1998). Even today, federal law disarms certain noncitizens—specifically, those who are unlawfully present in the United States, those who are present on nonimmigrant visas, and those who have renounced U.S. citizenship. *See* 18 U.S.C. §§ 922(g)(5), (7).

Like noncitizens, felons disarmed under § 922(g)(1) are not among "the people" protected by the Second Amendment because they have forfeited their membership in the political community. *Cf. Voisine v. United States*, 579 U.S. 688, 715 (2016) (Thomas, J., dissenting) (tying *Heller*'s approval of felon disarmament to the understanding that certain individuals "are beyond the scope of the 'People' protected by the Second Amendment"). States have long denied felons the rights of members of the polity—the right to vote, *see* U.S. Const. amend. XIV, § 2; *Richardson v. Ramirez*, 418 U.S. 24, 41-56 (1974); the right to hold public office, *see Spencer v. Kemna*, 523 U.S. 1, 8-9 (1998); and the right to serve on juries, *see id.* And as a leading 19th-century scholar explained, "the felon" has "been almost universally excluded" from "the *people* in whom is vested the sovereignty of the State." Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which*

42

*Rest Upon the Legislative Power of the States of the American Union* 28-29 (1868).

In line with the settled understanding that persons convicted of felonies may forfeit other rights belonging to members of the political community, § 922(g)(1) accords with the historical meaning of the Second Amendment by proscribing firearms possession "as a legitimate consequence of a felony conviction." *Tyler v. Hillsdale Cnty. Sheriff's Dep't*, 837 F.3d 678, 708 (6th Cir. 2016) (en banc) (Sutton, J., concurring in most of the judgment). While "[t]he Second Amendment establishes a fundamental right for American citizens to possess a gun," "*Heller* recognizes an exception for some Americans," including convicted felons—an exception that is both "sensible" and, more important, "historically grounded." *Id.*

Oquendo, citing the Third Circuit's en banc *Range* opinion, argues that other constitutional provisions use the term "the people," and that the meaning of the phrase should be the same across all of them. Appellant's Br. 27-28. But while the phrase "the people" refers to members of the political community throughout the Constitution, *see Heller*, 554 U.S. at 580, the scope of that community varies from provision to provision. For example, noncitizens are not among "the people" protected by the Second Amendment, *see id.* at 581, but certain noncitizens are among "the people" protected by the Fourth Amendment, *see United States v. Verdugo-Urquidez*, 494 U.S. 259,

43

265, 271-273 (1990). The same is true of felons. And many other constitutional provisions use the term "the people" in a manner that excludes felons who have forfeited the rights that come with membership in the polity. Such felons are not among "the people" who adopted the Constitution, *see* U.S. Const. Pmbl; or "the people" who are entitled to elect members of Congress, *see* U.S. Const. Art. I, § 2, Cl. 1; Amend. XVII, Cls. 1-2; or "the people" who reserved powers not delegated to the government, *see* U.S. Const. amend. X. So too, felons disarmed under § 922(g)(1) are not among "the people" entitled to keep and bear arms.

Oquendo augments his textual argument with the observation that he possessed ammunition "in the home, where the Second Amendment is most forceful." Appellant's Br. 29. But an individual either is, or is not, part of the "the People" under the Amendment—his status in the polity does not turn on where he keeps his bullets. In any case, *Heller* concerned possession of firearms in the home, but nonetheless emphasized that the right it announced excluded felons. *Heller*, 554 U.S. at 626-27.

Accordingly, this Court need not reach the stage of examining historical analogues to § 922(g)(1) because the text of the Second Amendment, as interpreted by the Supreme Court and supported by the historical record, makes clear that the right to keep and bear arms does not prohibit the disarming of felons. Rather, the right is

limited to "law-abiding, responsible citizens." *Heller*, 554 U.S. at 580.

### b. Section 922(g)(1) comports with this Nation's historical tradition of firearms regulation.

Even if Oquendo, as a convicted felon, were considered part of "the people" entitled to exercise Second Amendment rights, "this Nation's historical tradition of firearm regulation" confirms the validity of felon-disarmament laws. *Bruen*, 597 U.S. at 17. Two categories of historical regulation are salient: first, laws showing that the Second Amendment right traditionally has been restricted to law-abiding individuals, not convicted felons; and second, laws showing that the right traditionally has been restricted to responsible individuals, which excludes felons.

### i. The Second Amendment right historically has extended only to law-abiding individuals.

Because the Second Amendment "'codified a right inherited from our English ancestors,'" English legal tradition sheds light on the scope of the "right secured by the Second Amendment"— which, as with the English right, "'is not unlimited.'" *Bruen*, 597 U.S. at 20-21 (quoting *Heller*, 554 U.S. at 599, 626). In England before the Founding, felons had no right to keep and bear arms. The standard penalty for a felony was death. *See* 4 William Blackstone, *Commentaries*

45

*on the Laws of England* 98 (1769). That punishment extended even to non-violent felonies, such as smuggling, *id.* at 155; fraudulent bankruptcy, *id.* at 156; violating quarantine, *id.* at 162; forging a marriage license, *id.* at 163; and cutting down a cherry tree, *id.* at 4. A felon awaiting execution would be held in prison, where he would have no access to arms. *See id.* at 131 (discussing a statute making it unlawful to provide "any arms" to a "prisoner in custody for treason or felony").

A conviction would also usually result in the escheat of the felon's estate and the forfeiture of all his goods and chattels—including, of course, his arms. *See id.* at 379-82. A convicted felon, finally, was deemed "already dead in law" even before his execution. *Id.* at 374. That status, known as "civil death," involved "an extinction of civil rights, more or less complete." *Avery v. Everett*, 18 N.E. 148, 150 (N.Y. 1888). A convicted felon thus had no "right to vote, to sit as a juror, *to bear arms*, [or] to marry"; indeed, "his physical conditions were such that he could do none of these things." *Id.* at 156 (Earl, J., dissenting) (emphasis added).

Early Americans accepted that legislatures had the power to subject felons to similar deprivations. Thus, "death was 'the standard penalty for all serious crimes' at the time of the founding." *Bucklew v. Precythe*, 139 S. Ct. 1112, 1122 (2019) (citation omitted). As in England, the death penalty extended even to non-violent crimes, such as

46

forgery and horse theft. *See Medina*, 913 F.3d at 158. Many States also subjected certain felons to the complete forfeiture of their estates or their goods and chattels. *See* Beth A. Colgan, *Reviving the Excessive Fines Clause*, 102 Cal. L. Rev. 277, 332 nn. 275-76 (2014) (collecting statutes). And at least some States enacted statutes carrying forward the common-law doctrine of civil death. *See, e.g.*, *In re Deming*, 10 Johns. 232, 233 (N.Y. 1813) (per curiam). These punishments were justified by the belief that a person can lose his legal rights by violating "his part of the [social] contract." 4 Blackstone 375.

Because the traditional punishment for serious crimes was death, early legislatures had little occasion to enact laws explicitly disarming persons convicted of such crimes. But as the D.C. Circuit has observed, "it is difficult to conclude that the public, in 1791, would have understood someone facing death and estate forfeiture to be within the scope of those entitled to possess arms." *Medina*, 913 F.3d at 158. And, moreover, early legislatures *did* enact laws disarming persons who had committed certain offenses that were *not* punishable by death. For example, an English statute provided that a person could not "keep arms" if he had been "convicted in a court of law of not attending the service of the church of England." 4 Blackstone 55; *see* 3 Jac. 1, c. 5, § 16 (1605) (Eng.). In 1624, Virginia punished a person for "base" and "opprobrious" speech by ordering

47

him "disarmed" and declaring him ineligible to exercise "any priviledge or freedom" in the colony. David Thomas Koning, *"Dale's Laws" and the Non-Common Law Origins of Criminal Justice in Virginia*, 26 Am. J. Legal Hist. 354, 371 (1982). And in 1775, Connecticut enacted a statute providing that a person who was convicted of "libel[ing] or defam[ing]" certain colonial resolutions "shall be disarmed and not allowed to have or keep any arms." *The Public Records of the Colony of Connecticut From May, 1775 to June, 1776*, at 193 (Charles J. Hoadly ed., 1890). The fact that legislatures disarmed individuals who committed those offenses suggests, *a fortiori*, the constitutionality of disarming those who commit felonies.

Moreover, some Founding Era sources expressly recognized that the right to bear arms extended only to law-abiding individuals. In 1780, for example, the Town of Williamsburg, Massachusetts adopted a resolution proclaiming: "we esteem it an essential priviledge to keep Arms in Our houses for Our Own Defence and while we Continue honest and Lawfull Subjects of Government we Ought Never to be deprived of them." *The Popular Sources of Political Authority: Documents on the Massachusetts Constitution of 1780*, at 624 (Oscar Handlin & Mary Handlin eds., 1966). And Anti-Federalists at the Pennsylvania ratifying convention proposed a bill of rights that, among other things, forbade "disarming the people or any of them, *unless for crimes committed*,

48

or real danger of public injury from individuals." 2 *The Documentary History of the Ratification of the Constitution* 598 (Merrill Jensen ed., 1976) (emphasis added).

In short, at the Founding, disarmament of felons would have been broadly understood as permissible—and it remains so today.

### ii. The Second Amendment right historically has extended only to responsible individuals.

Beyond disarmament of convicted felons, the historical record—beginning well before ratification of the Second Amendment and extending to the present day—establishes a broader tradition of disarming categories of individuals who could not be trusted to responsibly keep and bear arms.

*England.* Limits on arms possession in the English tradition shed light on the limits of the Second Amendment. *Bruen*, 597 U.S. at 20-21. Among the limits well-established in England was the authority to disarm classes of people who, in the legislature's view, could not be depended on to obey the rule of law.

One law, for example, provided that any Catholic who refused to make a declaration renouncing his or her faith could not "have or keepe in his House or elsewhere" any "Arms[,] Weapons[,] Gunpowder[,] or Ammunition (other than such necessary Weapons as shall be allowed to him by

49

Order of the Justices of the Peace . . . for the defence of his House or person)." 1 W. & M., Sess. 1, c. 15, in 6 *The Statutes of the Realm* 71-73 (1688). Enacted shortly after the Glorious Revolution of 1688—when the Protestants King William and Queen Mary succeeded the Catholic King James II—this statute reflected the new government's perception that Catholics who refused to renounce their faith were among "those who are unwilling to obey the government and its laws." *Jackson*, 69 F.4th at 502 (internal quotation marks omitted).

This example is particularly relevant because the same Parliament "wr[ote] the 'predecessor to our Second Amendment' into the 1689 English Bill of Rights," which similarly drew a religion-based distinction, among other limitations. *Bruen*, 597 U.S. at 44 (quoting *Heller*, 554 U.S. at 593). That predecessor guaranteed that "Protestants . . . may have Arms for their Defence suitable to their Conditions, and as allowed by Law." *Id.* (internal quotation marks omitted). "Englishmen had never before claimed the right of the individual to arms." *Id.* at 44-45 (alteration and internal quotation marks omitted). Once they did, they ensured that the government retained the power to disarm a class of the population based on concerns that the members of that class had failed to show they would abide by the law.

50

More broadly, the English Bill of Rights was understood to permit the disarming of irresponsible individuals. To take one example, a number of 18th-century justice-of-the-peace manuals recognized that the Militia Act of 1662—which authorized local officials to disarm those judged "dangerous to the Peace of the Kingdome," 14 Car. 2, c. 3, § 13 (Eng.)—continued to permit local officers to disarm those they "judge[d] dangerous," notwithstanding the Bill of Rights' intervening guarantee. Robert Gardiner, *The Compleat Constable* 68 (3d ed. 1708); *see, e.g.*, Giles Jacob, *The Modern Justice* 338 (1716); W. Nelson, *The Office and Authority of a Justice of Peace* 464 (7th ed. 1721); G. Jacob, *Lex Constitutionis* 331 (2d ed. 1737); Theodore Barlow, *The Justice of Peace* 367 (1745).

Similarly, the Statute of Northampton made the offense of "rid[ing]" or "go[ing] armed" punishable by forfeiture of the offender's "Armor." 2 Edw. 3, c. 3 (1328) (Eng.); *see Bruen*, 597 U.S. at 41-43. Leading 18th-century scholars agreed that the Statute forbade carrying weapons in a terrifying manner, and that it made violations punishable by forfeiture of the weapons. *See, e.g.*, 4 Blackstone 149. The Statute thus allowed the government to disarm persons whose conduct revealed their unfitness to carry arms.

*Founding Era.* Many precursors to the Second Amendment reflected limitation of the right to responsible citizens. For example, as explained

51

above, in 1780 the Town of Williamsburg proclaimed its citizens' "essential priviledge to keep Arms" while they "Continue[d] honest and Lawfull Subjects." *The Popular Sources of Political Authority: Documents on the Massachusetts Constitution of 1780*, at 624 (Oscar Handlin & Mary Handlin eds., 1966). And the Pennsylvania Anti-Federalists proposed, at Pennsylvanian's ratifying convention, a bill of rights forbidding "disarming the people" except for "crimes committed, or "*real danger of public injury from individuals*." 2 *The Documentary History of the Ratification of the Constitution* 598 (Merrill Jensen ed., 1976) (emphasis added). Thus, the founding generation understood that "crimes committed" and "real danger of public injury" were independent bases for disarmament. *See Medina*, 913 F.3d at 158-59 (noting as much).

At the Massachusetts ratifying convention, Samuel Adams similarly proposed a bill of rights that would have denied Congress the power "to prevent the people of the United States, *who are peaceable citizens*, from keeping their own arms." 6 *Documentary History* 1453 (John P. Kaminski & Gaspare J. Saladino eds., 2000) (emphasis added). A contemporary described the proposal as an effort to protect "the right of *peaceable citizens* to bear arms." Letter from Jeremy Belknap to Ebenezer Hazard (Feb. 10, 1788), in 7 *Documentary History* 1583 (John P. Kaminski & Gaspare J. Saladino eds., 2001) (emphasis added). The

52

convention rejected the proposal, but only because Adams had waited until the morning of the day of ratification to present it. *Id.*

Although those precursors used different language from the Second Amendment, they shed light on its meaning. *See Heller*, 554 U.S. at 604 (relying on the "minority proposal in Pennsylvania" and "Samuel Adams' proposal"). The Amendment codified a "pre-existing," "venerable," and "widely understood" right, making it unlikely that "different people of the founding period had vastly different conceptions" of its scope. *Id.* at 603-05. The precursors discussed above reveal a common conception that the government may disarm those who are not responsible citizens.

Consistent with this understanding, early American legislatures denied arms to classes of individuals considered unfit to possess them. When the Revolutionary War began, for example, the Continental Congress recommended, and most States enacted, laws disarming loyalists and others who refused to swear allegiance to the new Republic. *See, e.g.*, 4 *Journals of the Continental Congress 1774-1789*, at 205 (Worthington Chauncey Ford ed., 1906) (Mar. 14, 1776); Act of Dec. 1775, *The Public Records of the Colony of Connecticut From May, 1775 to June, 1776, inclusive* 193 (Charles J. Hoadly ed., 1890); Act of Sept. 20, 1777, ch. 40, § 20, *Acts of the General Assembly of the State of New-Jersey* 90 (1777); Act of 1777, ch. 6, § 9, 24 *The State Records of North*

*Carolina* 89 (Walter Clark ed., 1905); Act of May 1, 1776, ch. 21, § 2, 5 *Acts and Resolves, Public and Private, of the Province of Massachusetts Bay* 480 (1886); Resolves of Apr. 6, 1776, 8 *The Statutes at Large of Pennsylvania from 1682-1801*, at 559-561 (1902); Act of 1776, 7 *Records of the Colony of Rhode Island and Providence Plantations in New England* 567 (John Russell Bartlett ed., 1862); Act of May 1777, ch. 3, 9 *The Statutes at Large: Being a Collection of All the Laws of Virginia, from the First Session of the Legislature, in the Year 1619*, at 282 (William Waller Hening ed., 1821). Similarly, after putting down Shays' Rebellion in 1787, Massachusetts required the rebels, as a condition of being pardoned, to surrender their arms, which would be returned to them after three years if they kept the peace. *See* Act of Feb. 16, 1787, §§ 1-3, 1 *Private and Special Statutes of the Commonwealth of Massachusetts* 145-147 (1805).

In short, the historical record from the Founding Era shows that "legislatures traditionally possessed discretion to disqualify categories of people from possessing firearms to address a threat purportedly posed by these people to an orderly society." *Jackson*, 69 F.4th at 503 (internal quotation marks omitted).

*Post-Founding.* Antebellum commentators expressed the Founding generation's understanding of the Second Amendment's scope. For example,

54

John Holmes, a legal scholar from Maine, interpreted the Second Amendment and its state counterpart to mean that a "free citizen, *if he demeans himself peaceably*, is not to be disarmed." John Holmes, *The Statesman, or Principles of Legislation and Law* 186 (1840) (emphasis added). "Thus are the rights of self defence guarded and secured," he added, "to every one who *entitles himself by his demeanor* to the protection of his country." *Id.* (emphasis added). A state convention in Rhode Island resolved that the Second Amendment forbade "taking from peaceable citizens their arms." *State Convention of the Suffrage men of Rhode Island*, Vermont Gazette, Dec. 13, 1842, at 1.

Opponents of slavery voiced similar views during the Bleeding Kansas conflict of the mid-1850s. On the one hand, they supported disarming groups responsible for violence in Kansas. Senator (and future Vice President) Henry Wilson, for instance, complained that "armed bandits" were "violating law, order, and peace," and called for legislation "to disarm any armed bands, from the slave States or the free States, who enter the Territory for unlawful purposes." Cong. Globe App., 34th Cong., 1st Sess., 1090 (Aug. 7, 1856). Senator Benjamin Wade likewise called on Congress to "[d]isarm these lawless bands." *Id.* at 1091. On the other hand, opponents of slavery criticized Kansas authorities for disarming "peaceable"

55

free-state settlers. *See, e.g.*, New-York Daily Tribune, Oct. 2, 1856, at 4 ("When [a Kansas official] entered the houses of peaceable citizens and demanded that they should deliver up their arms, he . . . violated one of those provisions of the Constitution which a free people should guard with the most jealous care."). A petition published in William Lloyd Garrison's newspaper urged the impeachment of President Pierce for his efforts to disarm "peaceable citizens." A.J. Grover, *Impeachment of Franklin Pierce* (Aug. 1, 1856), in The Liberator, Aug. 22, 1856, at 140.

Sources from during the Civil War reflect the same understanding. In 1863, a Union general ordered that "all loyal and peaceable citizens in Missouri will be permitted to bear arms." Hdqrs. Dep't of the Missouri, General Orders, No. 86 (Aug. 25, 1863), in *The War of the Rebellion: A Compilation of the Official Records of the Union and Confederate Armies*, ser. 1, vol. 22, pt. 2, at 475 (1888). And after the war, Senator Henry Wilson defended Congress's "power to disarm ruffians or traitors, or men who are committing outrages against law or the rights of men." Cong. Globe, 39th Cong., 1st Sess. 915 (1866).

As Reconstruction began, many southern States sought to disarm Black citizens, prompting "an outpouring of discussion" about the right to keep and bear arms. *Heller*, 554 U.S. at 614. Participants in that discussion affirmed the right to possess arms for self-defense, yet cautioned that

56

the right protected only "peaceable" or "well-disposed" citizens. In Georgia, for example, the Freedmen's Bureau issued a circular explaining that "[a]ll men, without distinction of color, have the right to keep arms," but that "[a]ny person, white or black, may be disarmed if convicted of making an improper and dangerous use of arms." H.R. Exec. Doc. No. 70, 39th Cong., 1st Sess. 65 (1866). The Bureau also recognized that the "freedmen of South Carolina have shown by their peaceful conduct that they can safely be trusted with fire-arms." H.R. Rep. No. 30, 39th Cong., 1st Sess. Pt. II, 229 (1866). And a Reconstruction order guaranteed the "constitutional rights of all loyal and well-disposed inhabitants" in South Carolina, but added that "no disorderly person, vagrant, or disturber of the peace, shall be allowed to bear arms." Cong. Globe, 39th Cong., 1st Sess. at 908-09.

Disarmament of irresponsible citizens was not limited to the context of the war, its inception, and its aftermath. Throughout the 19th century, legislatures disarmed a wide range of individuals deemed unfit to carry firearms. These laws included bans or restrictions on the sale of firearms to, or possession of firearms by, individuals below specified ages;[4] bans on gun sales to persons of

---

[4] *See, e.g.*, Act of July 13, 1892, ch. 159, § 5, 27 Stat. 117 (D.C.); Act of Feb. 2, 1856, No. 26, § 1, 1856 Ala. Acts 17; Act of Apr. 8, 1881, ch. 548, § 1, 16 Del. Laws 716 (1881); Act of Feb. 4, 1881, ch. 3285, No. 67, § 1,

57

unsound mind;[5] and laws disarming "tramps," or vagrants.[6]

---

1881 Fla. Laws 87; Act of Feb. 17, 1876, No. 128, § 1, 1876 Ga. Laws 112; Act of Apr. 16, 1881, §2, 1881 Ill. Laws 73; Act of Feb. 27, 1875, ch. 40, § 1, 1875 Ind. Laws 59; Act of Mar. 29, 1884, ch. 78, § 1, 1884 Iowa Acts 86; Act of Mar. 5, 1883, ch. 105, § 1, 1883 Kan. Sess. Laws 159; Ky. Gen. Stat. ch. 29, Art. 29, § 1, at 359 (Edward I. Bullock & William Johnson eds., 1873); Act of July 1, 1890, No. 46, § 1, 1890 La. Acts 39; Act of May 3, 1882, ch. 424, § 2, 1882 Md. Laws 656; Act of June 2, 1883, No. 138, § 1, 1883 Mich. Pub. Acts 144; Act of Feb. 28, 1878, ch. 46, § 2, 1878 Miss. Laws 175; 1 Mo. Rev. Stat. ch. 24, Art. II, § 1274, at 224 (1879).

[5] *See* Act of Feb. 4, 1881, ch. 3285, No. 67, § 1, 1881 Fla. Laws 87; Act of Mar. 5, 1883, ch. 105, § 1, 1883 Kan. Sess. Laws 159; Act of Feb. 17, 1899, ch. 1, § 52, 1899 N.C. Pub. Laws 20-21.

[6] *See* Act of Mar. 27, 1879, ch. 59, § 4, 1879 Conn. Pub. Acts 394; Act of Mar. 27, 1879, ch. 155, § 8, 16 Del. Laws 225 (1879); Act of May 3, 1890, ch. 43, § 4, 1890 Iowa Acts 69; Act of Apr. 24, 1880, ch. 257, § 4, 1880 Mass. Acts 232; Miss. Rev. Code ch. 77, § 2964 (1880); Act of Aug. 1, 1878, ch. 38, § 2, 1878 N.H. Laws 170; Act of May 5, 1880, ch. 176, § 4, 1880 N.Y. Laws, Vol. 2, at 297; Act of Mar. 12, 1879, ch. 198, § 2, 1879 N.C. Sess. Laws 355; Act of June 12, 1879, § 2, 1879 Ohio Laws 192; Act of Apr. 30, 1879, § 2, 1879 Pa. Laws 34; Act of Apr. 9, 1880, ch. 806, § 3, 1880 R.I. Acts & Resolves 110; Act of Nov. 26, 1878, No. 14, § 3, 1878 Vt.

Post-ratification sources point in the same direction as English and Founding Era sources. Although different commentators used different terms—"peaceable," "well-disposed," and so on—they recognized that a legislature could disarm those who were not law-abiding, responsible citizens.

### c. Comparison to § 922(g)(1)

The historical tradition surveyed above demonstrates that § 922(g)(1) is constitutional. *Bruen* calls for an analysis of "how and why" the historical and challenged regulations "burden a law-abiding citizen's right to armed self-defense." 597 U.S. at 29. Of course, § 922(g)(1) imposes *no* burden on "a law-abiding citizen's right to armed self-defense" because it applies only to people who have removed themselves from the law-abiding citizenry by committing offenses punishable by more than one year of imprisonment. In any event, the historical record shows that felons were historically subjected to dispossession of firearms—in addition to far more severe consequences, including estate forfeiture and capital punishment. History additionally shows that legislatures disqualified categories of people from possessing firearms, just as felon-dispossession statutes do today, based on legislative judgments that the disarmed people could not be counted on

---

Acts & Resolves 30; Act of Mar. 4, 1879, ch. 188, § 4, 1879 Wis. Sess. Laws 274.

59

to be responsible, law-abiding members of the polity.

Oquendo answers that federal law has generally prohibited felons from possessing firearms since 1961 (with an earlier ban limited to violent criminals dating to 1938)—not long enough to establish a historical tradition supporting felon disarmament. But the government need not show that this precise proscription dates back to the Founding—that is the precisely what *Bruen* rejected. "[A]nalogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." 597 U.S. at 30 (emphases in original). Section 922(g)(1)—which keeps with the historical tradition of disarming individuals categorically determined not to be law-abiding or responsible—passes that test.

### d. Oquendo may not obtain an as-applied exemption from § 922(g)(1) based on the nature of his prior felonies.

It is not clear whether Oquendo believes § 922(g)(1) is facially unconstitutional, or just unconstitutional as applied to him. But any as-applied argument would fail for several reasons.

60

First, nothing in *Heller*, *McDonald*, or *Bruen* suggests the need for a felony-by-felony analysis. To the contrary, *Heller* and *McDonald* explain that "permissible . . . exceptions" to the Second Amendment include "longstanding prohibitions on the possession of firearms by felons," with no explicit limitation on the nature of the felons' crimes. *Heller*, 554 U.S. at 626, 635; *see McDonald*, 561 U.S. at 786 (plurality); *see also Jackson*, 69 F.4th at 502 ("Given these assurances by the Supreme Court, and the history that supports them, we conclude that there is no need for felony-by-felony litigation regarding the constitutionality of § 922(g)(1).").

Second, recognizing that Congress may disarm individuals who have been convicted of crimes that satisfy the common definition of a felony—that is, crimes punishable by imprisonment for more than one year—is consistent with how the Supreme Court has interpreted other Bill of Rights provisions that require distinctions among different types of crimes. The Supreme Court has traditionally focused on the "maximum authorized penalty," which "provides an objective indication of the seriousness with which society regards the offense," rather than on "the particularities of an individual case." *Lewis v. United States*, 518 U.S. 322, 328 (1996) (alteration and internal quotation marks omitted). For example, the Grand Jury Clause applies only to "capital" or "infamous" crimes, U.S. Const. amend. V, and a

61

crime is "infamous" if it is punishable by "imprisonment for more than a year," *Branzburg v. Hayes*, 408 U.S. 665, 687 n.24 (1972). The Sixth Amendment right to a jury trial similarly does not extend to petty offenses, and an offense is petty if it is punishable by a prison term of six months or less. *See Blanton v. City of North Las Vegas*, 489 U.S. 538, 541-45 (1989). A similar approach should inform interpretations of the Second Amendment, which is subject to the same "body of rules" as "the other Bill of Rights guarantees." *Bruen*, 597 U.S. at 70. In particular, when a person has been convicted of a crime punishable by more than one year of imprisonment, the maximum authorized penalty for the offense by itself establishes that the crime is serious enough to support disarmament. *See Medina*, 913 F.3d at 160-61.

Third, a regime of individualized as-applied challenges to § 922(g)(1) would distort the separation of powers. In our constitutional system, the Legislative Branch traditionally determines the consequences of criminal convictions—not only the punishment, but also the collateral consequences, such as disfranchisement, disqualification from jury duty, ineligibility for public benefits, sex-offender registration, and disarmament. The Executive Branch, in turn, traditionally grants clemency if it determines that the punishment or the collateral consequences prescribed by

62

law do not fit a particular offender's circumstances. Creating a system of as-applied exemptions from § 922(g)(1) would in effect usurp the Executive Branch's role of deciding when to make "exceptions" to the "rigor" and "severity" of the "criminal code" enacted by Congress. *The Federalist* No. 74, at 501 (Alexander Hamilton) (Jacob E. Cooke ed. 1961).

Fourth, a regime of individualized as-applied challenges would also treat the right to possess arms differently from other rights that criminals forfeit upon conviction. As discussed above, States have long denied convicts the right to vote, the right to serve on juries, and the right to hold public office. A felon cannot obtain exemption from those disabilities on the ground that they do not fit his felony or his circumstances. This Court should not treat the right to possess arms any differently.

Fifth, individualized as-applied challenges to § 922(g)(1) would pose serious problems of judicial administration, creating a body of law that, in its reliance on historical analysis, would be complex to apply and prone to inconsistent results. Oquendo, for his part, does not even try to define the scope of legitimate felon dispossession, instead simply contending that disarming him based on "prior narcotics trafficking convictions"

63

is impermissible without explaining what distinguishes those felonies from others that may support disarmament. Appellant's Br. 29, 31.

Finally, any felony-by-felony review of § 922(g)(1)'s constitutional status would not help Oquendo. Before this offense, he was convicted of not just one felony, but *seven*, including narcotics distribution (long associated with gun violence) and possessing a pistol without a permit. PSR ¶¶ 41-47; *see United States v. Jefferson*, 974 F.2d 201, 206 (D.C. Cir. 1992) (noting the "deadly confluence of drugs and guns in our society"). The number and nature of Oquendo's felonies comfortably establish that he is not among the "law-abiding, responsible citizens" entitled to exercise the right to keep and bear arms. *Bruen*, 597 U.S. at 26.

64

## Conclusion

For the foregoing reasons, the judgment of the district court should be affirmed.

Dated: March 15, 2024

Respectfully submitted,

VANESSA ROBERTS AVERY
UNITED STATES ATTORNEY
DISTRICT OF CONNECTICUT

KENNETH L. GRESHAM
ASSISTANT U.S. ATTORNEY

Conor M. Reardon
Assistant United States Attorney (of counsel)

65

### Federal Rule of Appellate Procedure 32(g) Certification

This is to certify that the foregoing brief complies with the 14,000-word limitation of Second Circuit Local Rule 32.1(a)(4), in that the brief is calculated by the word processing program to contain approximately 13,975 words, excluding the items listed in Federal Rule of Appellate Procedure 32(f).

KENNETH L. GRESHAM
ASSISTANT U.S. ATTORNEY

**Addendum**

**18 U.S.C. § 924. Penalties**

. . .

**(c)(1)(A)** Except to the extent that a greater minimum sentence is otherwise provided by this subsection or by any other provision of law, any person who, during and in relation to any crime of violence or drug trafficking crime (including a crime of violence or drug trafficking crime that provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime—

**(i)** be sentenced to a term of imprisonment of not less than 5 years;

. . .

Add. 1